UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ANDRES PERALTA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal  No. 96-51-P-H |
| | ) | Civil No. 07-41-P-H |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |

**PROPOSED FINDINGS OF FACT**
**and**
**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Andres Peralta pled guilty to a conspiracy drug offense on November 19, 2004,

and was sentenced by this Court in May 2005 to135 months incarceration after the Court

determined he was a career offender and awarded him two downward departures.  Peralta

filed a 28 U.S.C. § 2255 motion and a supporting memorandum asserting three grounds.

I concluded that a fair determination of the merits of Peralta's ineffective assistance of

counsel claim justified the appointment of counsel on his behalf and, accordingly,

counsel was appointed.  Ultimately assigned counsel filed a supplemental motion to

vacate that provided further briefing but did not change the grounds alleged.  The United

States filed a response.  I ordered an evidentiary hearing.  That hearing was conducted on

two days: April 2 and April 16, 2008.  The evidentiary hearing was convened to address

only the issues arising in the context of the claimed ineffective assistance of trial counsel

at the time of the entry of the defendant's guilty plea and withdrawal of his motion to

dismiss.  Thus the proposed factual findings relate solely to that dispute.  Other grounds

did not raise contested factual disputes.  I now enter the following proposed findings of fact and I recommend that the court deny Peralta 28 U.S.C. § 2255 relief.

### PROPOSED FINDINGS OF FACT

<u>Andres Peralta's  and Frank Ortiz's Backgrounds</u>

Andres Peralta has a 10th grade education.  He was born in the Dominican Republic and although he has lived in the United States for many years, he speaks very little English and does not read or write in English.  On April 2, 2008, he testified that he was 38 years old.  Documentary evidence in the case suggests that Peralta was born either October 1 or 2, 1969 or 1970, depending upon which document you peruse.  Certainly the overwhelming weight of the documentary evidence at the time Attorney Frank Ortiz undertook his representation of defendant was that he was born in 1969.  While Peralta's testimony might be taken as conclusive evidence that he was born in 1969, I am unable to make such a finding and I interpret his testimony about his age as simply more evidence of the fact that his true birth date has been lost in the mists of time.  I do find that his retained counsel, Frank Ortiz, had no reason to dispute that Peralta was 18 at the time of his youthful adjudication in New York State and, thus, it was not ineffective assistance of counsel for Ortiz to have failed to raise this issue or conduct any further investigation into Peralta's "true" date of birth.  I acknowledge that, since the time of Peralta's  sentencing in this case, the discovery of his Dominican birth certificate and the sentencing transcript from the youthful offender hearing have provided significant evidence that Peralta was born in 1970 and was 17 years of age at the time of New York "conviction."

At the time of Peralta's arrest in May of 2004 he was working in a hotel in the New York City area.  The indictment in this case had been outstanding since 1996.

Following his arrest, his wife and brothers made arrangements to hire Frank Ortiz from Brooklyn, New York. Peralta had never met the attorney until Ortiz came to see him at the Cumberland County Jail in Portland, Maine. Ortiz graduated from Harvard Law School in 1958 and has practiced law continuously in New York State since 1959. Approximately 60 to 70 percent of Ortiz's practice has involved "state defendant criminal law." (Tr. 41: 12.) Ortiz speaks Spanish fluently and spoke only Spanish when communicating with Peralta. Ortiz's personal letters to Peralta were in Spanish and some legal documents, but not all of them, were translated into Spanish for Peralta.

The Ortiz retainer and billing records

On June 16, 2004, Peralta's wife signed a Letter of Engagement retaining Ortiz to represent her husband. (See Gov't Ex. 25.) Ortiz charged $250.00 per hour and required a $15,000.00 retainer, which represented the nonrefundable minimum fee, with $10,000.00 due at the time of signing and another $5,000.00 due on July 16, 2004. In his retainer letter, written in English, Ortiz clearly stated that he made no promises regarding the outcome of the case or the length of sentence that might be imposed by the court. Attached to the Letter of Engagement, in Spanish, is a list of client responsibilities and a list of client rights. (Gov't Ex. 25-T (translation provided).) The $15,000.00 was paid as required and by January 5, 2005, Peralta owed Ortiz an additional $20,155.30 for services rendered, for which Ortiz received an additional payment of $10,000.00 prior to the May 2005 sentencing. In conjunction with the sentencing an additional $10,000.00 bill, plus $600.00 in transportation expenses was incurred, leaving a balance due, after receipt of the $25,000.00, of $20,755.30. The balance of the bill has never been paid.

When questioned about his billing records during his testimony in conjunction with this motion, Ortiz indicated he would produce his billing records and three letters he described during his testimony.  (Tr. 115: 2-7.)  Although Ortiz produced the three letters, the signed retainer agreement, a copy of his revised bill, and some travel receipts, Ortiz has never produced his actual billing records.  Based upon the court's docket entries, Ortiz's affidavits, and the travel voucher receipts, it is possible to attempt to piece together the number of times Ortiz met personally with Peralta.  In his affidavit (Gov't Ex. 25) Ortiz says he met personally with Peralta on ten occasions during the period from June 2004 to May 2005.  The docket supports five minute entries showing Ortiz present in Maine with Peralta, viz., June 28, 2004, July 12, 2004, July 27, 2007, November 10, 2004, and May 16, 2005.  Ortiz's initial appearance on June 28, 2004, resulted in a continuance because he had not obtained local counsel and was not in compliance with the District of Maine's pro hac vice rule.  Subsequently, Attorney Thomas Dyhrberg entered his appearance as local counsel.

The documentary evidence supporting a September 21, 2004, personal visit with Peralta in Maine is a little sketchy.  All Ortiz provided was a receipt indicating a roundtrip air ticket between New York and Portland was purchased from Delta airlines on September 16, 2004, and that the air ticket was valid for one year.  On the same date a $100.00 service charge was paid in conjunction with that ticket.  The docket does not reflect any court activity on that date, but September 21, 2004, is the date on the signed plea agreement that was later filed with the court.  (Docket No. 112[1]; Gov't Ex. 9-B.) Ortiz's October 21, 2004, visit is supported by a copy of a Greyhound Bus Lines receipt

---

[1]       All Document Numbers refer to the docket in United States v. Peralta, 96-CR-51, the underlying criminal case, unless otherwise noted.

and itinerary round-trip between New York and Portland.  There is no documentation

surrounding the claimed visit on December 11, 2004, which is described as a probation

interview.  The presentence report (Gov't Ex. 16) says that Peralta was interviewed

December 1, 2004, at the Cumberland County Jail and defense counsel was present.  The

January 12, 2005, visit, while having no docket entries coinciding with this date, is

supported not only with a receipt and itinerary, but also by a copy of a January 12, 2005,

Delta Air Lines boarding pass between Portland and New York.  The February 28, 2005,

claimed meeting is supported by a Yahoo account e-mail promising a copy of a DL

Electronic Ticket in an attachment which is not available for review.   I conclude that the

evidence supports Ortiz's testimony that he made at least two or three trips to Maine in

addition to the five trips made in conjunction with court appearances.  However, the

crucial September 21, 2004, personal visit, relating to the signing of the plea agreement,

is not conclusively established based on this evidence.  Contemporaneous actual billing

records, as requested by the Government and by Peralta's attorney, would have been

much more persuasive on the issue of the number and timing of Ortiz's visits with Peralta

in Maine.

The Speedy Trial Motion to Dismiss

       One of the reasons Ortiz agreed to represent Peralta was that he felt the speedy

trial issue in this case was interesting and might provide a viable defense to the charge.

Although Ortiz, like any competent counsel, engaged the Government in plea

negotiations very early in the case, he did cause to be prepared a substantial, well

researched motion to dismiss the indictment on speedy trial grounds.  The motion was

filed on August 26, 2004.  (Docket No. 106; Gov't Ex. 6.)  The Government sought and

obtained an extension of the time allowed for its response, and ultimately, because a signed plea agreement was filed on October 1, 2004 (Doc. No. 112), the Government was never called upon to answer the motion.   As part of the plea agreement Ortiz withdrew the motion to dismiss.  (Gov't Ex. 10.)

Peralta received a copy of the motion to dismiss based upon a denial of a speedy trial, but because it was written in English he did not understand the particulars of the motion.  Ortiz told him that filing the motion would give them leverage in their plea negotiations with the Government.  Ultimately the motion to dismiss was withdrawn even though Ortiz informed Peralta that he could be sentenced to 188 to 235 months based upon his criminal history, regardless of the amount of cocaine.  (See Gov't Ex. 11T.) There is no evidence that Ortiz ever discussed with Peralta or the AUSA handling the case the possibility of pursuing the motion to dismiss and, if unsuccessful, entering a conditional plea of guilty to the indictment under the same plea agreement as negotiated in this case.  According to Ortiz, part of Peralta's motivation in deciding to plead guilty and forego the motion to dismiss was based upon his belief that because of his ethnic background as a Dominican the charges against him in the District of Maine would never be dismissed.  Ortiz tried to dissuade him from this line of thinking, explaining that the motion would rise or fall on its own merits, that he thought it was meritorious, but that he could not guarantee ultimate success on the motion.

The plea negotiations and plea agreement

Peralta's initial appearance was scheduled for June 28, 2004, four days after the Supreme Court announced its decision in Blakely v. Washington, 542 U.S. 296, 303 (2004).  Ortiz appeared with Peralta for arraignment on the indictment on July 12, 2004,

and, shortly thereafter, on August 5, 2004, wrote to AUSA Helen Kazanjian to memorialize their plea discussions.  (Gov't Ex. 3.)  The primary considerations in the plea agreement included a stipulated drug amount of 500 grams to two kilos resulting in a base offense level of 26, an agreement that the Government would move for an acceptance of responsibility three level downward departure, the Government's agreement to not file a Section 851 enhancement, and, finally, a consensus that Peralta would not be required to waive the application of the <u>Blakely</u> decision regarding any sentencing enhancements.

The evidence shows that on September 16, 2004, Ortiz sent Peralta a cover letter with a copy of the certain documents, including the plea agreement with significant parts of it translated into Spanish.  (<u>See</u> Def. Exs. 1T, 2 & 2T.)  Ortiz notes, in Spanish, the following:  "NOTE:  The importance of this agreement is that the court could impose a minimum sentence of five years-not ten-related to the amount of cocaine to a level "26" which could be reduced to "23" with the recommendation of the prosecutor and you are not waiving all the rights that warrant Blakely."  (<u>See</u> Def. Ex. 2T.)  In the cover letter Ortiz references his upcoming visit on September 21, 2004.  That fact, coupled with the fact that Peralta initialed each page of the plea agreement (a request not made in any of the submitted letters Ortiz sent to Peralta) and Ortiz and Peralta both dated the agreement September 21, 2004, persuades me that Ortiz did come to Maine to discuss the plea with Peralta before he signed it, in spite of Peralta's testimony that it was done through the mail.  (Tr. 21: 22-24.)  It is apparent from the exhibits that Peralta initially received the plea agreement in the mail, but I find it is more likely than not that Ortiz did come to Maine on September 21, 2004, to discuss the plea agreement with Peralta and obtain his

signature and initials on each page of the agreement as they discussed the implications of entering a plea of guilty.  This conclusion is supported by Peralta's own testimony that Ortiz did discuss the plea agreement with him when he came to see him after the arraignment.  (Tr.10:7-14.)

Once the signed plea agreement was filed with the court on October 1, 2004, a change of plea hearing was set for October 15, 2004.   Sometime between September 21, 2004, and October 15, 2004, Ortiz came to realize, for the first time, that Peralta's prior criminal record might well lead to him being classified as a career offender under the sentencing guidelines.  This realization resulted in Ortiz's letter of October 15, 2004, to Peralta explaining that his plea hearing had been continued from October15 because of the late realization that there was a very real possibility that Peralta would be sentenced as a career offender.  (Gov't Ex. 11T.)  Ortiz explained to Peralta that, even though the plea agreement had been signed, because he had not yet entered a plea of guilty it was very probable that he could proceed on the motion to dismiss without any "harm" to his rights.  Ortiz further explained, apparently for the first time, that Peralta could realistically be looking at a sentence of either 262 months to 327 months or 188 to 235 months.  Peralta understood from this letter that he was no longer looking at a 60-month sentence.  (Tr. 25: 18-23.)  Ortiz continued to attempt to negotiate with the Government to obtain a further reduction in the drug quantity allegations, but was unsuccessful. (Gov't Ex. 12.)  Peralta made a proffer and cooperated with the Government sufficiently to earn a motion for a downward departure and the Government's agreement not to oppose his motion for a departure based upon an overrepresented criminal history.  (Gov't

Ex. 14.)  Given this turn of events, Peralta nevertheless chose to enter a plea of guilty on November 10, 2004.

<u>The presentence report and the sentencing hearing</u>

Peralta's initial presentence report was prepared on December 22, 2004.  No points were deducted for acceptance of responsibility because Peralta's counsel had not submitted a timely acceptance of responsibility statement to the officer preparing the report.  The statement was submitted a few days later and a revised presentence showing a sentencing range of between 188-235 months was received on February 22, 2005.  In the interim, on January 12, 2005, <u>United States v. Booker</u>, 543 U.S. 220 (2005) was decided and the sentencing scheme in play at the May 16, 2005, sentencing hearing was, consequently, an advisory guidelines scheme.  The court, after awarding Peralta two guideline-based departures (one for an over-represented criminal history and one for his cooperation with the Government) and after considering the sentencing factors set forth in 18 U.S.C. § 3553, settled on a guidelines based sentence of 135 months.

During this period of awaiting the sentencing hearing a series of  three letters were exchanged between Peralta and Ortiz.  On February 7, 2005, Peralta wrote to Ortiz stating that Ortiz had promised him a sentence of 60 months based upon his "deal" with the Government.  Peralta went on to explain that he had made the financial sacrifice of hiring a private attorney in order to get the five-year sentence he expected.  (Gov't Ex. 22T.)  Ortiz responded to the letter on March 2, 2005, unequivocally denying that he had ever promised Peralta a sentence of 60 months and telling Peralta that if he intended to make such a false accusation he should tell Judge Hornby immediately that he had been mislead and he wanted a new attorney.  Ortiz offered to withdraw from representation of

Peralta based upon this dispute and also noted that he had an additional basis for withdrawal because Peralta had not kept current with the billing statement and owed Ortiz additional money.  (Gov't Ex. 23 ( orally translated during evidentiary hearing).)  At about this same time an additional $10,000.00 payment was made to Ortiz, leaving an unpaid balance of $10,155.30 which eventually mushroomed to $20,755.30 following the sentencing.  In any event, Ortiz never withdrew from representing Peralta because on March 9, 2005, Peralta wrote Ortiz a letter of apology explaining that he was depressed and apparently not thinking clearly when he wrote the earlier letter. (Gov't 24 (orally translated during evidentiary hearing).)

## DISCUSSION

First, Peralta claims that his criminal attorney delivered constitutionally inadequate assistance when he "wrongly, voluntarily" gave up on a "winnable" motion to dismiss the indictment in reliance on a prosecution-promised "quid pro quo" sentence. Second, Peralta believes that appellate counsel was ineffective when, after Peralta attempted to submit newly acquired evidence of Peralta's actual birth date to the First Circuit in a pro se submission in an effort to challenge his career offender status, counsel successfully moved to strike the filing without Peralta's permission.  And, third, Peralta argues that the United States "effectively 'breached the plea'" when it offered Peralta five years but then argued that he was a career criminal.

### A.      Standards Applicable to the Review of Peralta's Habeas Grounds

Peralta is entitled to 28 U.S.C. § 2255 relief only if his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without

jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255 ¶1.  The rule of thumb is that Sixth Amendment ineffective assistance claims are properly saved for airing in a 28 U.S.C. § 2255 proceeding.  See United States v. Peralta, 457 F.3d  169, 172 n.1 (1st Cir. 2006)("Peralta also has submitted a pro se brief which, in large measure, presents fact-specific arguments that trial counsel rendered constitutionally ineffective assistance of counsel. As is our custom, we shall let the district court have the first crack at these arguments, should Peralta wish to renew them in a motion under 28 U.S.C. § 2255.  See, e.g., United States v. Mercedes, 428 F.3d 355, 361 (2005).").

The two-pronged performance/prejudice Strickland v. Washington, 466 U.S. 668, 687-88 (1984) test applies to ineffective-assistance claims arising out of the plea process. See Hill v. Lockhart, 474 U.S. 52, 58-59 (1985).  "In order to prevail" under Strickland, "a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. De La Cruz, 514 F.3d 121, 140 (1st Cir. 2008) (citing Strickland, 466 U.S. at  688, 694). "In other words, a defendant must demonstrate both seriously-deficient performance on the part of his counsel and prejudice resulting therefrom."  Id.

### B.      The 28 U.S.C. § 2255 Claims

Of Peralta's three 28 U.S.C. § 2255 claims, the first in sequence is the most troublesome.  I address the claims in reverse order in the following discussion because the other two claims involve challenges to Peralta's status as a career criminal, a status that feeds into his first claim.  That is, it is Peralta's contention in his first claim that

counsel should have got a better handle on Peralta's exposure to a career criminal

determination prior to negotiating the plea agreement with the United States and

withdrawing the motion to dismiss.   By discussing the second and third claims before the

first it is easier to grasp the significance of counsel's performance with regards to

Peralta's decision to plead guilty in lieu of pursuing the motion to dismiss.

### 1. The plea agreement and Peralta's career criminal status

Peralta's last 28 U.S.C. § 2255 ground is not one that expressly pertains to the

performance of counsel.   He argues:

> The Government breached the plea agreement in this case when it
> expressed its belief that the defendant should be sentenced as a career
> offender, after having signed a plea agreement for a sentence of from five
> years minimum, if the defendant would drop his motion to dismiss the
> indictment for violation of "speedy Trial", promising him the minimum
> exposure.  However, the government at sentencing, made full argument
> for the "Career Offender" Guideline enhancement.

(Sec. 2255 Mem. at 37.)

There is nothing about this claim that was not known to Peralta at the time of

direct appeal.  What is more, as the United States points out, it is a claim that he did raise

in his pro se supplemental brief in his direct appeal.  (See Appellant Supp. Brief at 6 -10,

Docket No. 8-4.)   The First Circuit indicated that it had considered Peralta's arguments in

this brief and concluded "that they provide no basis for upsetting Peralta's conviction and

sentence." See Peralta, 457 F.3d at 172 n.1.   As Peralta merely repeats the same facts

and arguments used in his supplemental appellant brief, this is a ground that falls within

the rule that claims already decided on direct appeal will not be revisited by the court in a

28 U.S.C. § 2255 motion.  See United States v. Singleton, 26 F.3d 233, 240 (1st Cir.

1994);  Barrett v. United States, 965 F.2d 1184, 1190 n.11 (1st Cir. 1992);  Dirring v.

<u>United States</u>, 370 F.2d 862, 863-64 (1st Cir. 1967); <u>compare</u> <u>Robson v. United States</u>, 526 F.2d 1145, 1147-48 (1st Cir. 1975).[2]

      **2.**      **Counsel's performance with respect to the submission of the transcript of the 1988 hearing to the First Circuit Court of Appeals**

      Peralta's second ground pertains to the decision of his appellate counsel to ask the First Circuit to strike from the record a transcript of the disposition on Peralta's 1988 New York drug offense.  Paragraph 31 of Peralta's Pre-Sentence Investigation Report (PSI), under the header of adult criminal convictions, lists the date of the offense as January 28, 1988, and indicates that Peralta was eighteen at the time of the conviction.  (PSI ¶ 31.) Sentence was imposed on March 22, 1988, with Peralta receiving five years of probation. (<u>Id.</u>)  This probation was terminated, early, on April 9, 1990.  (<u>Id.</u>)  The preparer indicated:  "There is no further information regarding this offense of conviction at this time.  It is unknown if the defendant had attorney representation in his matter."  (<u>Id.</u>)

      The transcript of the New York proceeding includes a representation by Peralta's attorney to the New York court that Peralta was seventeen-years-old.  (<u>See</u> Docket No. 1-2 at 7.)  Peralta has also filed a recently acquired copy of a birth certificate in Spanish which represents an October 1, 1970, birth date, in hopes of substantiating his claim that he was not eighteen at the time of the predicate offense.  (<u>See</u> Docket No. 1-3.)   The PSI indicates that Peralta was born October 1, 1969.  The United States, recognizing that the attorney made this representation to the New York court, indicates: "It is not at all clear that Peralta was only seventeen when he was convicted in 1998."  (Gov't Mem. at 33 n.8.)

---

[2]      Even if this Court were to reach this claim it seems clear from the record that no such agreement was made by the United States.  For example, a letter from the prosecutor to Peralta's attorney on November 8, 2004, (the change of plea hearing was held on November 10, 2004) represents:  "The Government further agrees that if the defendant is found to be a career offender under United States Sentencing Guidelines § 4B1.1, the Government will not oppose a motion by the defendant for a downward departure under U.S.S.G. § 4A1.3, to the extent the court determines is appropriate."  (<u>See</u> Docket No. 8-2.) The Government never opposed the downward departure and, in fact, the Court granted it.

It contends that, as Peralta never objected to the statement in the PSI that he was born in 1969 and was eighteen at the time of the crime, the Court was entitled to rely on these representations.  (Id.)

While it is true that the Court was entitled to rely on these unchallenged PSI representations, the question apropos Peralta's ineffective assistance claim is whether or not Peralta's appellate attorney had any reason to press a challenge concerning his client's age at the time of that 1988 conviction.  This ground is framed as one that attacks appellate counsel's conduct vis-à-vis this question; Peralta has not established any basis for concluding that trial counsel was given any reason for lodging this particular attack.[3]

With respect to appellate counsel's performance, the United States has provided the court with a copy of the letter that appellate counsel sent to the First Circuit after counsel realized that a paralegal had filed the transcript with the appellate court.  The letter reads:

> RE:     U.S. v. Peralta, Appeal No. 05; Request to Return Improperly Filed Pro Se Document; Response to Pro Se Document; Notification of Accompanying Motion to Stay to Investigate Important Information Newly Disclosed in the Pro Se Motion.
>
> To The Court:
>
> I am writing to ask that they return to me, Mr. Peralta's counsel of record, the letter brief filed on behalf of my client, which contained a transcript of his 1988 New York State change of plea for a youthful offender disposition.  I am asking that the letter brief be stricken from the record. My client has acted through an inmate paralegal to submit this transcript. I, his CJA attorney, did not submit this transcript, nor did I approve of its

---

[3]     In his third ground Peralta does contend that the attorney who represented him during the pre-plea proceedings should have fully investigated the potential that Peralta would qualify as a career offender prior to advising Peralta to take the plea and forgo the motion to dismiss.  However, Peralta never suggests that he gave this attorney a reason to believe he was born in 1970 rather than 1969.  The May 12, 2004, Rule 5 affidavit by the arresting U.S. Marshal indicates that the United States had identifying information apropos Peralta that listed his birthday as October 1, 1969 and October 2, 1969.  (Rule 5 Aff. at 2 n.1, Crim. No. 96-04-P-H, Docket No. 88.)  It also indicates that in May of 2004 Peralta was carrying a license with a date of birth identical to one of the October 1969 dates.  (Id. at 3.)

submission; nor did I ever see this transcript.  The inmate paralegal cites F.R. App, P 28(j) as authority for filing this document on behalf of Mr. Peralta.  While I have found this inmate paralegal to be very knowledgeable and helpful in the past, he has, in this instance, crossed the line.

Rule 28(j) refers to submission of supplemental legal authorities, such as cases or statutes, not evidence, such as a newly discovered transcript. ….
[Text of the rule omitted.]
The use of "citation" [in the rule] shows that the rule[] permits supplemental legal authorities.  Therefore, I request that the clerk return the transcript and letter brief to me at the above address.

In the event that the clerk retains the letter brief on the docket, I am writing also to respond to its contents.  By way of reminder, one of our contentions on appeal is that the prosecution failed to prove that my client's youthful offender disposition rested on an adjudication of guilt.  I am writing to stress that his provision of the transcript does not change that the prosecution failed to carry its burden of proof on the question of adjudication of Mr. Peralta's sentencing hearing in the U.S. District Court.  The question is not whether proof existed in the world.  The question is whether the proof was brought into the courtroom and presented by the party with the burden of proof.  The answer to that question is still no.

The transcript also supports appellant's argument based on the <u>Shepard</u> case.  The transcript shows the wisdom of the rule that only judicially definitive documents can be relied on to establish the pertinent facts of prior convictions.  Statements in a PSR, made on the basis of a probation officer's telephone work, should not be enough.

Finally, I am filing separate motions seeking a stay of any action in this appeal so that I can investigate the dramatic new information contained in the letter brief.  The information is very important and the inmate paralegal has performed an excellent service in helping Mr. Peralta obtain this transcript.  The crucial information in the transcript is that my client's lawyer, in 1988, informed the New York court at the Youthful Offender disposition hearing that my client was 17.  The prosecutor apparently accepted that information because she did not object.  Andres Peralta is a Spanish-speaking, no-English-speaking, legal immigrant, born in the Dominican Republic, who may have been mistaken about his age when he accepted the PSR's statement that he was born on October 1, 1969, which would have made him 18 at the time of the Youth Offender disposition offense.  See accompanying motion.

(Docket No. 8-5 at 2-3.)

The First Circuit docket contains the following relevant entries. Peralta's "supplemental authority" was filed on June 29, 2006. On July 5, 2006, his appellate counsel filed the above letter and his motion seeking to stay the appellate proceedings and reopen briefing and argument.[4] On this day counsel also filed an ex parte motion to incur reimbursable expenses in order to visit Peralta at his federal detention facility. On August 10, 2006, the First Circuit entered an order that granted the motion to strike and denied the other two motions. On August 14, 2006, the Court entered a second order indicating that the motion to hold any decision or reopen briefing and argument was denied without prejudice to either party's opportunity to seek a rehearing after issuance of an opinion. Also on August 14, 2006, the First Circuit issued its decision on direct appeal. United States v. Peralta, 457 F.3d 169 (1st Cir. 2006). On August 25, 2006, Peralta filed a pro se petition for rehearing or rehearing en banc. On October 4, 2006, both requests in this motion were denied.

As the First Circuit noted, Peralta's career offender status was properly determined under the 1995 version of the United States Sentencing Guidelines. Peralta, 457 F.3d at 170. The First Circuit Court of appeals gave close attention to Peralta's non-age-related challenge to the use of the 1988 "youthful offender" conviction:

> Peralta's flagship argument, and the only argument that warrants an extensive response, is that the district court erred in finding him a career offender under the applicable 1995 version of U.S.S.G. § 4B1.1(a) ("A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."). Peralta says that he should not have been regarded as a career offender because one of the two "prior felony convictions" on which this finding was premised-a 1988 New York "youthful offender adjudication,"

---

[4]     Neither party has supplied the court with this document.

<u>see</u> N.Y.Crim. Proc. Law § 720.10, for the attempted sale of a controlled substance in the third degree-should not have been counted under U.S.S.G. § 4B1.1. Pointing out that the term "conviction" in U.S.S.G. § 4B1.1 is functionally defined in U.S.S.G. § 4A1.2(a) as involving an "adjudication of guilt" obtained by "guilty plea, trial, or plea of <u>nolo</u> <u>contendere</u>," Peralta says that the government failed to establish that his 1988 "youthful offender adjudication" was so obtained.

<u>United States v. Peralta</u>, 457 F.3d 169, 170 -71 (1st Cir. 2006) (footnote omitted).

Granted the Panel did not address Peralta's new claim that he was only seventeen at the time of the conviction, but it is also evident from its decision to deny rehearing that it did not believe that his new attack on the use of the conviction warranted disturbing its decision, a decision that centered on the propriety of using the 1988 conviction. Furthermore, the First Circuit cited to the  Second Circuit's <u>United States v. Jones</u>, 415 F.3d 256 (2d Cir. 2005) for the proposition that the Panel could take notice of the fact that an adult "conviction" is a necessary prerequisite to a youthful offender adjudication. <u>Jones</u> "considered whether New York State youthful offender adjudications are 'classified as' adult convictions under New York law for the purposes of the Career Offender guideline." <u>Id.</u> at 261.  In reaching the conclusion that the youthful offender convictions could qualify as convictions for U.S.S.G. § 4B1.2 purposes, the Court analyzed <u>United States v. Cuello</u>, 357 F.3d 162 (2d Cir. 2004), and observed: "In <u>Cuello</u>, unlike the previous cases discussed, we considered a section of the Guidelines that contained the precise language at issue in this case: <u>a conviction that occurs before the age of eighteen</u> will be deemed an adult conviction 'if it was classified as an adult conviction under the laws of [New York].'" <u>Compare</u> U.S.S.G. § 4B1.2, comment. (n.1) <u>with</u> U.S.S.G. § 2K2.1, comment. (n.5)."  415 F.3d at 263 (emphasis added).  The <u>Jones</u> Court reasoned:

> [F]ollowing the pragmatic approach set out in the previous cases, the <u>Cuello</u> Court reasoned that classification as an adult conviction under the

laws of New York does not mean we look to whether New York calls it a conviction, but rather, that we look to the substance of the proceedings. See id. at 168. Accordingly, we held that the Cuello defendant's youthful offender adjudication was "classified" as an adult conviction under the laws of New York because the defendant "was indisputably tried and convicted in an adult forum, and ... served his sentence in an adult prison." Id. at 168- 69. In conjunction with this holding, we again noted that the nature and purpose of New York's youthful offender statute indicate that a youthful offender adjudication does not eliminate defendant's culpability entirely, see id. at 167-68, and cited with approval a case from another circuit applying youthful offender adjudications to the Career Offender guideline, id. at 168 (citing United States v. Pinion, 4 F.3d 941 (11th Cir.1993)). It logically flows that our holding in Cuello should be applied to this case. Thus, Jones's 1993 youthful offender adjudications should be deemed "adult convictions" as Jones (1) pleaded guilty to both felony offenses in an adult forum and (2) received and served a sentence of over one year in an adult prison for each offense.

Id. at 263 -64.

With respect to the performance of appellate counsel, Peralta's attorney was limited by the arguments available to and raised by Peralta's original counsel during sentencing.  Appellate counsel made it clear in his letter to the First Circuit that he was concerned that the transcript undercut his argument that there was no cognizable adjudication of Peralta's 1988 guilt.  Moving to strike the filing was a strategic choice that is not assailable under the performance prong of Strickland.  "Appellate counsel is not required to raise every non-frivolous claim, but rather selects among them to maximize the likelihood of success on the merits."  Lattimore v. Dubois, 311 F.3d 46, 57 (1st Cir.  2002) (citing Smith v. Robbins, 528 U.S. 259, 288 (2000), citing Jones v. Barnes, 463 U.S. 745 (1983)).  The pro se filing having been stricken, the First Circuit described counsel's argument on the underlying claim as "very ably advanced," but, noting that it was not raised during sentencing, concluded that this Court's counting of the adjudication did not constitute "plain error."

Even if appellate counsel could have presented the information about Peralta's age in his counseled pleadings or did not seek to have the transcript stricken, it seems highly probable that the First Circuit would have concluded that the argument was unpreserved. I suppose that under the Second Circuit law discussed above the best argument appellate counsel could have made would have been that the fact that Peralta was under eighteen at the time of the crime coupled with the fact that he received probation and did not, in contrast to the defendants in Cuello and Jones, serve time in an adult facility made his case distinguishable.

On this score it is important to note that counsel and the Court, while presuming that Peralta was 18-years-old at the time, explored the significance of the fact that the 1988 youth offender resulted in a probation-only sentence.  During the sentencing defense counsel indicted that his information was that he thinks his client would have committed the crime three to four months after his eighteenth birthday, whereas Cuello involved the question of whether or not under-eighteen-convictions should be treated as adult convictions. (Sentencing Tr. at 6-7.)  Sentencing counsel argued that in Peralta's case there was no jail sentence and the five-year term of probation was terminated after two years.  (Id.)[5]

This Court reasoned:

Turning to paragraph 31 of the presentence report, it is clear that the defendant was 18 or older at the time of the offense.   It's also clear that the penalty could exceed one year, although in that case, it did not, but as I read from the definition, the actual sentence imposed does not make a difference.  It's the possible sentence.
I have read the Second Circuit case.  I agree there is no First Circuit case directly on point.  In addition to the Cuello decision that the lawyers have cited, I also note United States versus Sampson, a later 2004

---

[5]        Counsel also questioned whether the Court should rely on Second Circuit law in this analysis.  The First Circuit clearly approved of this approach in its decision on direct appeal.

> decision, that deals specifically with New York procedure of youthful
> offender status, and that is consistent with the government's position that
> the later lenient treatment for youthful offenders does not erase the
> conviction.  That occurs upon the initial plea or trial, and therefore the
> youthful offender adjudication remains countable under the guidelines.
>
> I conclude, therefore, that paragraph 31 does qualify as a predicate
> offense.

(Id. at 13.)

Had appellate counsel succeeded in convincing the First Circuit that the newly

discovered evidence that Peralta was seventeen at the time of the 1988 adjudication

warranted a remand,[6] it would be for this Court to revisit the question of whether that fact

would have changed its sentencing analysis.  Since the matter was not remanded for

resentencing, this Court has no vehicle by which to revisit this issue, as there is no viable

constitutional ineffective assistance claim pertaining to either trial or appellate counsel on

the question of Peralta's age at the time of his New York conviction.

**3.     Counsel's performance vis-à-vis the motion to dismiss and the plea
agreement**

Peralta's third ground is the tail that wags the dog in this 28 U.S.C. § 2255

proceeding.  Because of concern relating to Peralta's ineffective assistance claim

concerning the motion to dismiss and the decision to plead guilty, I entered an order on

June 28, 2007, appointing counsel for Peralta and ultimately held an evidentiary hearing

in April 2008.

Key to my determination to hold an evidentiary hearing was the following

summary of Peralta's pro se argument:

---

[6]      I am assuming that, although the question may be a legal determination, the First Circuit would
have at best remanded for resentencing.  Its decision to deny rehearing and rehearing en banc is an indicator
that this was not the type of sentencing claim that it would have resolved on direct appeal sans a remand.

Peralta represents that after the prosecutor offered a plea deal with the penalty range of 5 to 40 years, his attorney told him that "he was contacted by the AUSA in charge of the case who made him a firm offer of the sentence of five years." (Id. at 12.) His attorney "made a solemn promise" to Peralta "that he 'had a contract with the AUSA' but, that first, movant would have to give him more money, some ten ... thousand dollars more than the fifteen thousand[ ] already paid to him." (Id. at 12, 19.) Peralta believes that the prosecution exhibited bad faith in the plea negotiations when it convinced Peralta to withdraw the speedy trial motion and argues that the motion should be "re-instated." (Id. at 15.) "The point being," Peralta explains, "there existed a strong possibility that the entire case would have been dismissed with prejudice, had [his] attorney ... properly investigated the client's criminal history before so easily being mislead by [the] prosecution into dismissing the motion." (Id. at 16-17.)

(Order Appointing Counsel at 3-4.)

It is clear after the evidentiary hearing that Peralta was never promised a five-year sentence by either the Government or his retained counsel. I do not doubt that Peralta hoped against all odds that he would receive a sentence toward the five-year end of the spectrum and that he believed that hiring expensive counsel from New York City would help him achieve that goal. Part of the problem in this case, it seems to me, is the cultural and language difficulties that arose for Peralta in dealing with serious criminal charges in the District of Maine. Ironically, even though the federal sentencing guidelines classify Peralta as a career offender, his criminal history prior to this case does not suggest that he had a great deal of experience with "jailhouse lawyering." He had actually served very little time inside a correctional facility and did not have realistic expectations about how federal sentencing guidelines would operate in his case. However, his lack of realistic expectations was not caused by anything Attorney Ortiz said or did vis-à-vis the advice he gave about the choices he had to make. Ortiz informed Peralta of the risks, explained a range of options to Peralta, and allowed Peralta to make the final decision about whether to proceed with the motion to dismiss or to plead guilty under the terms of a plea

agreement.  Peralta knew, *at the time he entered the plea*, there was a serious risk that he would classified as a career offender.  The decision to enter the guilty plea and cooperate with the Government was, in the final analysis, Peralta's own decision.  I cannot find that Ortiz provided ineffective assistance of counsel.

At the time he commenced plea negotiations Ortiz found himself in a post-Blakely/pre-Booker world and negotiating an early agreement with the Government to stipulate as to drug quantity and to agree to forego any § 851 enhancement made strategic sense.  There has never been any suggestion that Peralta was not guilty of the charges or that the Government lacked the evidence to prove his guilt.  The charges were either going to be dismissed because of the denial of a speedy trial or there was going to be a guilty plea.  Ortiz's performance was competent when the case is viewed in that light.  He prepared and filed a well written, carefully researched motion to dismiss.  He informed Peralta that the motion had some merit and it would certainly give them some leverage during plea negotiations, but that he could never guarantee that the motion would ultimately be granted.  Peralta, faced with his own fears of ethnic bias and whatever other motivations he may have had, did not want to take the risk of pursing the motion to dismiss to what might have been an unsatisfactory conclusion.  It is true that Ortiz might have tried to negotiate with the Government regarding a conditional plea of guilty with the same plea agreement after a ruling on the motion to dismiss, but there is no way to know now whether or not the Government would still have been willing to enter into a stipulation regarding drug quantity and foregoing the § 851 enhancement after it had obtained a favorable ruling on the motion to dismiss.  That Ortiz chose not to pursue that strategy does not render his representation ineffective.  His advice to Ortiz, after coming

to the realization that there was a real risk of career offender status being imposed, was to pursue the motion to dismiss.  However, Ortiz made it clear that there were risks with that strategy, including the risk that the Government would no longer be interested in the plea agreement, and Peralta chose to cooperate and enter a plea of guilty.

The final issue raised by Peralta's pleadings and the evidentiary hearing relates to the issue of whether Ortiz threatened to withdraw from representation of Peralta if he did not receive another $10,000.00 payment prior to sentencing.  Other than Peralta's vague and unsupported allegations on this issue, the only real evidence is contained in the three letters between Peralta and Ortiz that were exchanged after the presentence had been prepared and prior to sentencing.  Ortiz, in addition to making it clear in his letter that he had never promised a five-year sentence, also mentioned that Peralta's bill was not current and that was another reason why he would withdraw from representation if Peralta was unsatisfied with his performance.  Ortiz never made any attempt to withdraw and continued to represent Peralta through sentencing.  Although Peralta's wife did make the $10,000.00 payment on the account, by the time of the sentencing Peralta's bill was still in arrears and Ortiz proceeded as his attorney.   The evidence simply does not support Peralta's veiled assertion that additional money was extorted from his family in order to "guarantee" that he received the "promised" five-year sentence.

### *Conclusion*

For the reasons set forth above, I recommend that the Court **DENY** Peralta 28 U.S.C. § 2255 relief on the three grounds asserted in his motion to vacate.

<u>NOTICE</u>

      A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                      /s/ Margaret J. Kravchuk
                      U.S. Magistrate Judge

April 29, 2008